Our first case this morning is International Union of Operating Engineers Local 139 v. Schimel. Mr. Berzon. Thank you, Judge Flanagan. May it please the court. In light of Sweeney v. Pence, the first question I would assume is what are we asking this court to do? And what we're asking this court to do, respectfully, is to utilize its procedures to eventually have the full court, in one form or another, either under Rule 40e or however the court would wish to proceed, reverse Sweeney v. Pence. We think the court should do that for several reasons. First, this is a very important issue, potentially affecting hundreds of thousands of workers in the Seventh Circuit. It is an issue that has not been definitively resolved by this court in that there was a 5-5 vote on an en banc, and what was a bit unusual about that vote is the five dissenting judges didn't just dissent, but they dissented for the reasons set forth in Chief Judge Wood's panel decision, which was a merits decision. So there really does not seem to be comfortably a final view of this court on the issue. Since Sweeney v. Pence, Wisconsin has now passed a right-to-work law, which is before this court, that is the strictest kind of law. Counsel, there are quite a few right-to-work laws throughout the country. Has any court of appeals ruled in favor of the line of argument you mentioned? No, they haven't, Your Honor, but they've really divided in a very quite even way. This court, as best we can tell, did divide on the merits, five on one side, two on the other side, three didn't declare because they just voted to deny the en banc. The D.C. Circuit was a two-to-one decision, but interestingly, Judge Easterbrook, of the D.C. Circuit judges, it was one-to-one. Now, it is a binding decision on the D.C. Circuit. It's a binding decision. You don't rely on any appellate decision, in other words. So what you're wanting us to do is not simply to overrule our case, but to create a conflict among the circuits in the process. It would create a conflict with a 1982 D.C. Circuit decision. That is correct, Your Honor, as I indicated, a decision that was a very close question. And I think with quite a few others. No others. No others? No others, Your Honor. No others, Your Honor. And, in fact, there were two Supreme Court cases. So how do you count the Sims decision in the Fifth Circuit or the Pueblo of San Juan decision in the Tenth Circuit? Those decisions were not directly on the question of 14B. To my recollection, those were not. Or the Hardin County decision in the Sixth Circuit. The Hardin County decision was a very different decision that dealt strictly with whether localities had the ability to pass right-to-work laws. They did not decide, in this case, whether a state has an ability to pass a right-to-work law that prohibits school- Why would there be any difference between local laws and state laws for purposes of Section 14B? Oh, absolutely. The question is whether Congress, if whatever right-to-work laws can provide, the question in the Hardin County, or in the Hardin case, or Hardin County case, was whether the Congress intended by use of the word state to include, and this would be for all right-to-work laws. I could understand an argument that local laws might be outside the scope, but state laws within it. If I understand the Sixth Circuit, they said the law was valid. And that would make this situation a fortiori. The Sixth Circuit did not go back and revisit the legislative history or the wording of 14B. They didn't revisit Beck as such. They didn't revisit the Supreme Court's last word on this issue, which was Justice White's unanimous decision in retail clerks. So I do think that as far as the Supreme Court is concerned, this is very much an open issue. And the only two courts that have ever directly addressed the issue as whether a state can ban all payments and provide for complete free ridership, as opposed to just banning membership and banning the practical equivalent thereof, such as dues, has only been decided twice. In Sweeney v. Pence and in the Plumbers case, where I indicated Senior Judge Lombard on the Second Circuit, was the swing vote on that case. Now, most importantly, why should this court revisit the issue? Because with all respect, Sweeney was wrongly decided. And it's the role of this court to faithfully adhere to both the wording and the intent of the 1947 Taft-Hartley Act. And as Chief Judge Wood showed in Sweeney and Judge Mikva indicated in the Plumbers case, and as Justice White strongly suggested in his opinion for the court in Retail Clerks I, the Taft-Hartley Act, and in particular 14b, was not designed in any way to provide for complete free riding. First of all, the wording. The wording talks about membership. And as Chief Judge Wood said, paying for a dinner at the Chicago Club is not membership in the club. Judge Mikva said much the same. And Judge Posner of this court, in the Wedgeside case, referring specifically to membership, said to call paying the cost of service, like in this case, for example, a lawyer or an arbitrator to keep your job, does, as membership, changes its literal meaning and indeed virtually to invert it. And that's a quote from Judge Posner. The legislative history of Taft-Hartley is very clear that Congress had two goals. One was to eliminate the closed shop, but the other was to prevent free riding, which the Congress in 1947 saw as an evil. Senator Taft, the author of the bill, and I've read every word of the legislative history now, is quite clear on that. Condolences. Pardon me? Condolences. Yes. Believe me, yes. But I wanted to make sure there was nothing in it that was contrary to what Senator Taft said, what the report, committee report said, and the like. And Justice Brennan's opinion for the Supreme Court in the Beck case construing 8A3 and narrowing the term, maybe inverting it, as Judge Posner said, the term membership. Justice Brennan's opinion in Beck is very clear throughout that free ridership was not the intent of the 1947 Congress. One of the twin objectives was to eliminate free ridership. More specifically, not only is the wording of 14B very narrow, membership, but none of the legislative references to 14B in the committee report, the conference report, the floor debates, indicate in any way that paying for services that are rendered and no more, that is, no free riding, was a problem. All the references to 14B, and there are many, talk about compulsory unionism. And they talk about what that means in the legislative history, and they say the clothes shop, the union shop, and maintenance of membership, which means once you're in, you can't get out until the end of the contract. Never did they indicate having to pay for services and not free ride was a problem. It just wasn't. Now, the majority opinion in Sweeney made much of the fact that there were 12 states that had right-to-work laws in 1947, some of which, not all, had provisions like Wisconsin's and like Indiana's and Sweeney. But there is not one word in that legislative history that indicates anyone in Congress was familiar with the fact that there were some states that had provisions that said specifically no payments can be made to a union. Now, I should add that some states, some of those laws actually said no collective bargaining at all, and some of them said no hiring calls, and all of those are permitted under Taft-Harley. But if anybody did know that, in fact, there was a state law that said no payment of any kind to a union, free riding is allowed, why would Congress in 14B have said that what the states can do is ban voluntary agreements between labor and management that require membership? They would have said what states can do is they can ban any agreements that require payments to unions. So that is, to me, that is the best answer on that, and that brings us to Beck, which is obviously the 800-pound gorilla in the room, because Justice Brennan and the Court in Beck construed over three interesting dissents by Justice Blackmun, Justice Scalia, and joined by Justice Scalia and joined by Justice O'Connor, construed 8A3 in a different way than we say membership should be construed here. The Court limited what nonmembers could be required to pay, but that decision was not based on the wording, was not based on the legislative history, except to say that they wanted to, in 1947, eliminate free riding. That analysis of 8A3, not 14B, was because the Court thought, mistakenly, under a now-discredited theory that Justice Brennan himself had adopted in Hansen under the Railway Labor Act in 1961, that there could be state action if an employer and a union voluntarily agreed to limit hiring to union members. They thought there could be state action. Why? Because Shelley v. Kramer had provided for state action in enforcing a contract, and that theory is now thoroughly discredited, but nonetheless, the Court said that under cases of constitutional avoidance, such as the Bartolo, we're going to construe 8A3 to not reach that issue. Secondly, the Court wanted to match up the NLRA with the Railway Labor Act, and three years after, four years after Taft-Hartley was passed, Congress passed a Railway Labor Act provision comparable to 8A3, which the Court, in the opinion by Justice Brennan in 1961, had construed to narrow membership to its core component of simply providing for the payment for collective bargaining and related expenses. Mr. Berzon, to your point about the 12 States and the awareness or lack thereof by Congress, in Retail Clerks in 1963, they say Congress seems to be well-informed in these laws referring to the 1947 debates. So I appreciate your argument, but what are we to make of it? What you're to make about that is that is not a legal holding of the Supreme Court. Well, I appreciate that, nor is legislative history. No, but it is a factual statement. It's either correct or not. Right. And you know what the Supreme Court said about its factual statements, if they turned out to be incorrect? That was an opinion. That was Retail Clerks, too. It was an opinion by Justice Douglas. Right. And, frankly, Justice Douglas got his facts wrong on that, and what the Supreme Court said in the Kurtzahn case. What do you think is the likely outcome of a Seventh Circuit decision saying the Supreme Court is just flat wrong in Case X, and in Case Y it got its facts wrong? No. It got its law wrong in Case X, got its facts wrong in Case Y. We aren't following it. No, I'm not asking you to say the Supreme Court was wrong in Beck. Beck stands for what it stands for. The Supreme Court narrowed 883 to be consistent with the Railway Labor Act. I'm asking you to respect that, fully respect that. With regard to a factual statement in a Supreme Court opinion that is incorrect when looking at the facts, the Supreme Court itself said, is the Court having once written dicta calling a tomato a vegetable bound to deny that it is a fruit forever after? That was in the Kurtzahn case. This is a fact. It's either true or it isn't. If the Supreme Court says that July 17th never happened last year, it doesn't mean this Court is required to follow it. That's not a holding. It was just an observation. It wasn't necessary to Justice Douglas' opinion and retail clerks, too, on a completely separate issue. Well, perhaps you could clear it up by pointing to what in the legislative history that you studied that would point in a different direction than the conclusion that the Court had in 63. Yes, because, first of all, there is nothing there that indicates the legislature knew what was in ñ knew that there were states that had banned all payments. But if there were, almost certainly the Court ñ there are two things. Almost certainly the Congress would not have railed about free ridership as it did because those provisions allow for free ridership. They wouldn't have said one of our twin goals is to eliminate free ridership and to make sure it doesn't occur. So I think to start with, the Congress would have not done that. And secondly, I think we can assume that Congress would have used different wording than the term membership. And third, there's a third. The Court did say what it meant. It said we mean compulsory unionism. And they talked about what that meant. And each time they did, they talked about the clothes shop, the union shop, and maintenance of membership, all of which are what are considered compulsory unionism, not paying for a service, paying for a lawyer, paying for an arbitrator. So I think we can be comfortable with that. And finally, I do want to talk about retail clerks, one, because it is right on point. That's, I think, the most telling opinion for this Court if it wants to get it right in terms of what Congress did in 1947. The Court spent great, took great length, several pages to explain when the union said all we're doing is charging for services. So that's not prohibited. That's allowed under 14B. The Court said, no, you're not. You've made that argument up. You're charging these nonmembers the same thing you're charging the members, full freight. And therefore, that is something the states can prohibit under 14B. If, in fact, the states could prohibit any payment, there would have been no reason for Justice White to spend several pages explaining that. And secondly, Justice White said, and we leave for another day, another day, whether under 14B, where there's no Railway Labor Act counterpart, like in the Beck case with 883. We leave for another day whether, in fact, just charging for services can be barred by the states under 14B. And that day has not yet arrived, Your Honors. And we request that you take steps to get it right, get the issue in shape, because we could have a right-to-work law in Illinois too. And there are many states around the country, other circuits deserve the benefit of this Court's reasoned analysis, not leaving it at five judges voting on the merits to say that the Indiana law was invalid, two saying it was valid, and three, as far as we know anyway, have taken no public position on the issue. If it's at all close, Justice in Beck, we think there is a constitutional question here and it cuts our way, and that is the takings issue. And we think that the Court should proceed to hold. Why is that properly before us? It is before you in two respects. First of all, even if we didn't raise the issue, as it wasn't raised in Sweeney, it is before you for constitutional avoidance reasons. You still have to reach the issue to determine if it's a serious issue, whether that should be pointed to how you should. No, I'm asking why it is before us at all in Williamson County. Because it is right. Because we sued. And if it's not in the statute, has this been presented to the Wisconsin judiciary? It doesn't have to be for several reasons. Let me explain why. The Seventh Circuit has held, following Supreme Court law in Williamson, that first of all, if the three reasons, if you have a pre-enforcement facial challenge to a statute, you are entitled to bring that as a federal case for an injunction. And that's true here. Two, all applications under the NLRA are covered by this statute. Two, and even more significantly, Williamson provides if you can't get just compensation from the state, you can sue directly in federal court for an injunction. Here, the only remedy we can get is an injunction. Why? The union is not entitled to compensation unless an employer enters into an agreement with the union providing that all employees have to pay a representation fee. If the employer were to do that here, the employer could be prosecuted. It's a crime. So there is no agreement. The eight agreements that have been signed are contingent on a final judgment that, in fact, it is not a crime. And the only way to get an injunction against a prosecution is directly in federal court. Otherwise, the union isn't even entitled to just compensation. Why? Because there's no agreement that gives it the right to be there. It can't have the agreement unless the state law that makes it criminal is struck down. So we're covered there. And third, this court in Peters also made it clear that you can sue directly for an injunction. When there is a private – when there is a taking for a – not for a public use but a private use, this is taking from one union member giving to the non-member. Do you want to reserve some time, Mr. Berza? Yes. And let me just add one final thing. The Supreme Court in Yates, the Grouper case, relying on many, many Supreme Court cases held, that statutes can have different constructions, words can have different constructions even in the same statute. Here we're dealing with two different statutes. 8A3 was enacted in 1935 in the Wagner Act. That's where the term membership was written. And 14B was adopted in a completely separate statute 12 years later using the same term, different meaning, 1947. Thank you. Thank you, Mr. Berza. Mr. Walsh. May it please the Court, Brian Walsh on behalf of the State of Wisconsin. Sweeney v. Pence is the law of this circuit. And, quote, a three-judge panel of this court is bound to follow it and – No, we aren't. We have, unlike most other courts, one panel can overrule another. I absolutely agree with you, Judge Easterbrook. We pointed that out in our brief. But I'm quoting from page 4 of the plaintiff's opening brief, which concedes that this court, if it's a three-judge panel, should follow the – This opening brief cannot change circuit law. We have the authority to overrule Sweeney. So just proceed on that assumption. The problem is that the unions make no attempt to argue that this court should overrule Sweeney. I'd rather heard Mr. Berzon make just such an argument. Yes, that's right. He argues that Sweeney is incorrect. And under this court's stare decisis precedent, merely pointing out that a previous decision was incorrect doesn't get your foot in the door under the compelling reason standard. They also point out that the vote over en banc rehearing was close. That also is categorically an insufficient reason under the compelling reason standard. The reasons to stand by Sweeney, by contrast, are not only compelling, they're overwhelming. It's a recent decision of this court. It interprets a statute. It aligns this court with the undivided position of the federal courts who have considered these issues, which includes the D.C. Circuit and, as Judge Easterbrook pointed out, Hardin County. In Hardin County, it was a fortiori that a state could ban union security agreements of this kind. It also is easy to apply and no factual statutory or doctrinal developments cast any doubt on its soundness. What's more, Sweeney is correct. It's holding that the National Labor Relations Act permits states to ban union security agreements of this kind follows from two basic settled propositions of law. First, a provision in the collective bargaining agreement that requires employees to pay their pro rata share of what are known as chargeable expenses, which includes expenses related to negotiating the collective bargaining agreement, administering the contract, and handling grievances, is a provision that imposes, quote, unquote, membership within the meaning of 158A.3. That's the holding of communication workers of America against Beck, which builds upon General Motors. The second proposition is this. The meaning of membership under Section 158A.3 is the same meaning of membership in Section 164B, the key provision allowing states to ban, quote, agreements requiring membership, unquote. Retail Clerks I held that the meaning of membership in both provisions is the same. So here we have proposed fair representation agreements that would require employees to pay their share of chargeable expenses, which all parties agree is permissible as a matter of federal policy under 158A.3, and so it must be that it is susceptible of state prohibition under Section 164B, so Act I is plainly lawful. Now, the unions counter with a few arguments, but each of which has been considered and rejected not only by this court in Sweeney, but by the Supreme Court of the United States in the cases that I've mentioned and the other side has focused on. First, they say, well, membership should be given its literal definition in 164B. Problem is, the Supreme Court has already held that membership is kind of a term of art in this context. Their next argument is, well, under Retail Clerks I, the Supreme Court's interpretation of membership in 164B should not apply to union security devices that they call less stringent than the union security device in that case. The problem, there are two problems. The first is, as the D.C. Circuit pointed out, it's not the facts of Retail Clerks I that binds. It's the rationale. It's the principle of the case, and the principle is, as the court put it, that the connection between the two provisions is clear. What the first permits as a matter of federal policy, the second puts to the states under 164B. The second problem is that the unions are forced to take one of two positions. One, after Beck, Section 164B does no work. They actually candidly admit this in their response reply. They say that there is no room for state right-to-work laws to do any work after Beck because no union security agreement that would be subject to prohibition by a state is even permitted in the first place under Section 158A.3. Now, they do argue that Beck should be overruled, but whether Beck's interpretation is strained, as they say, or whether it is cramped, as they say, or whether it does violence to the statutory text, as they say, are arguments that are more properly directed to the body with authority to overrule that precedent. The last argument they call an alternative argument. They say, well, even taking communication workers against Beck as a given, the union security device in this case requires less than what a union security agreement under Beck could permit. There are two problems with this argument. First, we've pointed out that the language of the proposed fair representation agreements in this record, and they appear repeatedly, such as at A19-20, track Beck's language exactly. They require employees to pay their share of the expenses relating to negotiating the CBA, administering the contract, and processing grievances. So we've pointed out that the language is the same. And in their response reply, they don't respond to that point. In any event, we both agree that if, as the union say and we say, that a union security agreement that imposed fees less than the total amount of Beck, this is Beck chargeable expenses minus one penny, if a union security agreement requires employees to pay that amount, it's permitted under 158-83 because it imposes membership. We all agree on that. But then under Retail Clerks 1, if it imposes membership, as we agree, then it imposes membership under 164-B. Moving to the takings claim, again, they seem to think, and we agree, that Sweeney versus Pence, the analysis in that case governs. We think Sweeney got this exactly right. This argument, this identical theory was raised and considered by the panel in that case. Now, as a preliminary matter, we think it's not properly before this Court, because Williamson County holds that litigants under the takings clause are required to give a State an opportunity to deny just compensation. And until it's done that, there can't be said to be a jury. I hope that's not the holding. I hope the holding is it's to give States an opportunity to provide just compensation. States can't deny just compensation when it's due. That violates the Constitution. I take the point, Judge Easterbrook. That's a good correction. The point is to give the State system an opportunity to provide compensation. Right. Whatever compensation is due under the Constitution. Whatever compensation is due. They argue that they fit within this Circuit's two exceptions to that rule, but neither applies. First, they argue that seeking relief in the State courts would be futile, but the problem is that the Wisconsin Constitution has a takings clause of its own. Its meaning tracks that of the Fifth Amendment. The Supreme Court of Wisconsin has held that that takings clause is self-executing, that where a takings plaintiff lacks a cause of action under the statutes of the Wisconsin legislature, he or she may bring a takings claim directly under Wisconsin Constitution's takings clause, and that no sovereign immunity defense would bar relief in that case. The second exception applies to pre-enforcement facial challenges. The problem here is that, as this Court pointed out in Daniels, the facial standard for a pre-enforcement takings challenge is that a plaintiff must show that there are no set of circumstances under which the law can be constitutionally applied, and that mere enactment of the challenged law deprives them of all or substantially all economically viable use of their property. This is an uphill battle, as the Supreme Court put it in Keystone. They would have to show that Act I of the duty fair representation with a combination of the two have deprived their representational services of all of their economically valuable use, and we think that they have not shown that that is true, although it is true that they purport to make a facial takings claim. Now, moving to the merits, if this Court thinks that the takings claim is properly before it, it should reject it for the reasons given in Sweeney, plus several other reasons. The first, most straightforward point is that Act I, the only law challenged here, Wisconsin's right-to-work law, makes no demand of union services at all. It prohibits unions from forcibly collecting money from other people. The source of the obligation that the unions complain of is Section 9 of the National Labor Relations Act, which the Supreme Court has held requires an exclusive representative to comply with the duty of fair representation. I'll explain a little more about the duty of fair representation in a minute, but that's not the duty imposed by Act I, as this Court pointed out in Sweeney with regard to Indiana's materially identical right-to-work law. The second point is that even if this lawsuit were understood as a challenge to the duty of fair representation or to the right-to-work provision or the two in combination, it would fare no better because the Supreme Court has long held that when a sophisticated economic entity accepts a special government privilege to which is attached rational and legitimate conditions, that actor cannot later be heard to argue that acceptance of those conditions amounts to a regulatory taking. This is the holding of Monsanto, which has been recited. Where's the privilege here? A contract between a union and an employer setting up a union security clause is just a contract between a union and an employer. National Labor Relations Act says that with few exceptions, no one can interfere with that contract. It doesn't require the contract. It doesn't enable the contract. It's just a contract. Two points, Your Honor. I think the privilege here is the exclusive representation privilege, which the Supreme Court has likened to a legislative power. When a union is certified as an exclusive bargaining representative, the individual employees in the bargaining unit lose their rights to negotiate terms and conditions of employment with their employer. At the same time... That's a sense in which contract is limited. But my point is not that there are no limitations of contract rights in the National Labor Relations Act. It's that union security clauses are in the first instance and predominantly a matter of contract. They aren't created by government. They aren't imposed on anybody by government. I agree that they're a matter of contract when the parties are proposing to negotiate them. But the Supreme Court has said repeatedly that the right to enter into such a clause is conferred as a matter of legislative grace. I don't think that this is a right that a party ordinarily has under the common law to force another person to pay it money, to give that entity... Look, you know, it's very difficult to unravel what's going on here. Before the National Labor Relations Act, what would happen was that the employer would agree to pay the amount of money directly to the union. The National Labor Relations Act forbade direct payments from employers to unions, and that's what set off the request for union security clauses, where you get indirect payments via check-offs. But the old contract right, which was limited by the NLRA, the old contract right for the employer to pay the union directly, has simply been replaced by the union security clause. It's a very complex and historically contingent sequence, but I find it very hard to pretend that this is some kind of privilege created by a legislature. One needs to tackle it as a contract case. Even accepting that, Your Honor, I still think that the exclusive representation power is one conferred by the legislature. That's why it's subject to what the Supreme Court in Steele called constitutional-type limitations. You can't use the exclusive representation privilege to go out of your way to discriminate against a member of the bargaining unit, because otherwise constitutional questions would arise. That's what the Supreme Court said in Steele in 1947. And so I think the duty of fair representation and this 164 statutory limitation on the conditioned right to enter into union security agreements are both parts of the bargain that any would-be exclusive representative knowingly accepts when that entity elects to become an exclusive representative. Another problem is that the unions could not even begin to show that Act I or the duty of fair representation or both deprives them of all or substantially all economically viable use of their services. They say that they spend considerable expenses in bargaining and in processing grievances. I'll take one at a time. The problem with the argument that they are necessarily benefiting all employees in the bargaining unit by bargaining is that there are many in a bargaining unit who may object to the union's existence in the first place. They may prefer to negotiate their own terms, and they may be positively harmed by the bargaining positions that the union takes in negotiations. Suppose an employee would prefer to be paid according to merit, whereas the union would prefer a seniority pay system. That employee is harmed by the bargaining position of the union. Secondly, on grievances, an important point to understand in assessing their takings claim is this. This is a takings argument, so they have to show that the government is making a demand of their services in a particular way. I understand that unions have historically provided a certain level of grievance representation that has been, in some cases, generous. But the question is, does the law require them to provide that? The answer is no. They have a duty to administer any grievance process system that they adopt in a way that does not discriminate against members of the bargaining unit, that doesn't act in bad faith or arbitrarily toward members of the bargaining unit, but it doesn't require them to adopt the most expensive system they can imagine. It could be a pay-per-use system. It could be a non-exclusive system, as the unions have actually conceded in their response reply. So the argument that the federal government through the NLRA is requiring them to take up a grievance and take it all the way through arbitration when a non-member so requests is just flat wrong. It's also wrong that the unions have to take up a representation when they don't think it would benefit them or the bargaining unit as a whole. They owe no individual duty to the employees as such. They owe a duty to the bargaining unit. Finally, the duty of fair representation in Act I do not take property within the meaning of the takings clause in the first place under the binding position of Justice Kennedy and Justice Breyer in the Apfel decision.  which is that a law that imposes a general obligation to perform an act that may benefit another but that does not target specific or identifiable tangible interests in property and is indifferent actually as to how the regulated entity chooses to comply with the law cannot be said to impose a taking. As Justice Breyer put it, when it's a general liability and not to the government but to third parties, the court simply draws the line and says that does not violate the interests at the heart of the Fifth Amendment. But that's exactly what the duty of fair representation is. It's an imposition on unions to take a general act with respect to employees. The law is indifferent as to what funds they use to perform that act, whether it's dues money, whether it's money they've raised, whether it's money they've invested. So it can't be said that that duty targets a specific and identifiable interest in private property. Now regarding the private use takings theory, we pointed out that that's not right either, but even if this court were to conclude that it were right, the problem is for the unions that under the public use requirement, the court has basically analogized it to a rational basis test. And so as Sweeney held, Act I, State Right to Work Law, that's materially identical to Act I, serves a rational basis. So does the duty of fair representation. If there are no further questions, I will take my seat. Thank you, Mr. Walsh. I believe, Mr. Burson, your time has expired, but you may have an additional two minutes. Thank you, Judge Clown. First, retail clerks, one, did not say membership is the same in both statutes. They said when there were full dues payments involved for nonmembers, the two statutes overlapped. But they said they were leaving open the question of whether that would be true in other circumstances. Second, there are facts. We didn't just provide the union in the fair rep agreement. The contingent one that's signed with eight employers, depending on this court's ruling, didn't just provide for full representation fees. They had a specific sum. It was 1% of monthly dues plus $17.50, which is less than the back dues would otherwise be. That's fourth. Next. Sorry. The fact that there was a state law takings claim under the state constitution in Sweeney v. Pence was held in the majority opinion to be irrelevant to whether they could reach the federal issue in Sweeney v. Pence. Fourth, and most importantly with regard to takings law, the state is confusing what the feds require and what the state requires. The duty of fair rep comes from federal law. When the state is going to take private property, what the state has to accept, the background principles from an independent source, here that's federal law. All the state is doing is saying this service that the unions have to provide, you can't charge for it. That's no different than with the raisin growers. There was a law since 1937 that required that raisins could be required a portion of the crop to be sold for free. The Supreme Court struck that down. If you told a gas station owner that he had to provide free gas to certain people, that would be a takings. This is no different. And finally, duty of fair rep, exclusive representation. This all stems from the back of these sites. But it is not true that the unions can just walk away from a grievance procedure, not only because of the DFR, but because no employer would agree to a grievance procedure, because it's voluntary, that would allow any lawyer to come in off the street and just bring a grievance. The grievance procedure is between labor and management. It's a matter of contract, as Judge Easterbrook said. And the decisions of each arbitrator become part of the contract. So it is built into the structure that one has to have exclusive representation. Thank you, Your Honor. Thank you, Mr. Berzon. Thank you, Mr. Walsh. Thanks to all counsel. The case will be taken under advisement, and the court will proceed to the second case.